UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHRISTOPHER AND FREIDA
SHINGLETON,

Plaintiffs,

vs.                                    Case No.:

SHELLPOINT MORTGAGE
SERVICING, LLC

Defendant.
_____/

## **COMPLAINT**

Plaintiffs, CHRISTOPHER and FREIDA SHINGLETON, hereby sues Defendant, SHELLPONT MORTGAGE SERVICING, LLC pursuant to the Fair Credit Reporting Act ("FCRA"), Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"), and Breach of Contract, and in support thereof, Plaintiff states as follows:

## **JURISDICTION, VENUE & PARTIES**

1. This is an action for monetary, injunctive, and other equitable and statutory relief, brought pursuant to violations of the FCRA, 15 U.S.C. § 1681 et seq., and for violations of Florida Statutes Chapter 501.

2. This court has jurisdiction pursuant to Federal Statutes.

3. Venue is proper in this court pursuant to 28 U.S.C. § 1391 as the events and omissions that give rise to the statutory violations and claims have occurred and continue to occur within Seminole County, Florida.

4. Plaintiffs are residents of Florida and are "consumers" pursuant to 15 U.S.C. § 1681a(c) and F.S. 501.203(7).

5. Defendant is incorporated in the State of South Carolina and is authorized to transact business in Florida. SHELLPOINT's principal place of business is 75 Beattie Place, Greenville, SC 29601.

6. Diversity jurisdiction exists as the Plaintiff is a resident of one state and the Defendant is an entity incorporated in a distinct separate state.

7. SHELLPOINT is a "person" as defined by 15 U.S.C. § 1681a(b).

8. At all times relevant to this Complaint SHELLPOINT engaged in acts or practices in the conduct of "trade or commerce", as defined in F.S. 501.203(8).

## FACTS

9. Plaintiff obtained a mortgage from Banc of California, National Association d/b/a Banc Home Loans in September of 2016.  A copy of said Agreement is attached hereto as Exhibit A.

10. On September 10, 2017, Plaintiffs' home suffered damage due to Hurricane Irma.

11. The damage sustained to the home did not exceed Plaintiffs large hurricane insurance deductible.  As a result, any and all expenses associated with making necessary repairs to the home made it difficult to continue making loan payments.

12. In order to rectify and cure any default with their loan the Plaintiffs contacted their loan servicer, Caliber Home Loans ("CALIBER") and submitted a request for loss mitigation.

13. CALIBER advised the Plaintiffs that they were eligible for a forbearance, a period of time where they would not be required to make payments.  Plaintiff were advised by CALIBER that all payments accruing during the forbearance period would be deferred to the end of the loan without any additional interest or penalties.

14. On or about January 27, 2018 CALIBER provided Plaintiffs with an approved Fannie Mae Capitalization and Extension Modification Trial Period Plan.  Pursuant to the terms

of said plan, the Plaintiffs were to receive a modification with a fixed interest rate of 3.875%, which was to be fixed for 361 months from the effective date. Plaintiffs were to make trial payments of $1,266.10 on March 1, 2018, April 1, 2018, and May 1, 2018. See Exhibit B attached hereto.

15. Plaintiffs accepted the loan modification by contacting CALIBER prior to February 10, 2018 and in addition, the Plaintiffs made their first payment to CALIBER on or before March 1, 2018.

16. When the Plaintiffs attempted to make their second payment they were advised that CALIBER was unable to accept any additional payments as the loan had been service transferred to SHELLPOINT. CALIBER instructed the Plaintiffs to contact SHELLPOINT to continue with payments.

17. Plaintiffs contacted SHELLPOINT to resume payments and were advised by SHELLPOINT that the onboarding process had not been completed, no loan documents or history had yet been received, and that SHELLPOINT could not accept payment(s) until that process was finished.

18. Once the onboarding process was completed SHELLPOINT advised Plaintiffs that it was not going to honor the loan modification proposed by CALIBER as it did not conform to Fannie Mae's guidelines.

19. The loan modification proposal suggested by SHELLPOINT extended the term to forty (40) years as opposed to the thirty-one (31) year proposal from CALIBER. Additionally, the SHELLPOINT proposal contained an unpaid principal balance ("UPB") of $206,000.00 as opposed to the UPB of $196,000.00 in the CALIBER proposal.

20. SHELLPOINT has repeatedly refused to honor the agreement offered and accepted by its predecessor and has threatened Plaintiffs with the initiation of foreclosure proceedings if they did not agree to the new modification proposal.

21. Due to the onboarding delay the Plaintiff's credit account was documented and reported as delinquent by SHELLPOINT for a period of time.

22. SHELLPOINT knowingly misreported the status of its Plaintiffs' account to the various credit bureaus.

23. SHELLPOINT failed to conduct a reasonable investigation into the accuracy of the information it was reporting to the various credit bureaus.

24. SHELLPONT failed to update Plaintiffs' credit bureaus once it had notice that the charges were disputed.

25. The Plaintiffs credit score and credit history has been negatively impacted as a result of the actions of SHELLPOINT. As a result of the negative impact, several creditors closed accounts belonging to Plaintiffs that were otherwise in good standing.

26. In March 2019 the Plaintiffs attempted to refinance their home with the intention to capitalize on the equity to assist the family with their children's college education expenses as well as provide some financial relief during that time. The Plaintiffs were denied financing due to SHELLPOINTS inaccurate reporting of late mortgage payments. See Exhibit C attached hereto.

27. Plaintiffs have been devastated by theses series of events and have suffered tremendous stress as a result thereof. Mr. Shingleton has been hospitalized as a direct result of this stress and has incurred unnecessary medical expenses.

28. All conditions precedent prior to filing the instant action have been performed, have occurred, or have been waived.

## COUNT I

## VIOLATION OF THE FAIR CREDIT REPORTING ACT

29. Plaintiff sues Defendant, SHELLPOINT**,** and alleges:

30. Paragraphs 1 through 28 are hereby re-alleged and incorporated herein by reference, as if fully set forth below.

31. The FCRA prohibits furnishers of information to consumer reporting agencies from furnishing any information relating to a consumer to any consumer reporting agency if the furnisher knows or has reasonable cause to believe that the information is inaccurate.

32. The FCRA requires furnishers of information to consumer reporting agencies to conduct a reasonable investigation when the furnisher receives notice of a dispute regarding the completeness or accuracy of the reported information from a consumer reporting agency.

33. SHELLPOINT has violated the FCRA by knowingly misreporting information to Plaintiffs various credit bureaus.

34. SHELLPOINT has violated the FCRA by failing to conduct a reasonable investigation when it received notice of Plaintiffs dispute and for failing to report the results of its investigation to the various credit bureaus.

35. The FCRA authorizes the Court to award monetary civil penalties in the event of a knowing violation, which constitute a pattern or practice of violations.  Each instance that SHELLPOINT has misreported the amount owed by Plaintiffs to the various credit bureaus constitutes a separate violation of the FCRA.

36. As a result of the above violation of the FCRA, SHELLPOINT is liable to Plaintiffs for injunctive and declaratory relief and actual damages, statutory damages, and attorney's fees and costs.

WHEREFORE, Plaintiff requests that judgment be entered against the Defendant for the following:

    a.  Declaratory judgment that Defendant's conduct violated the Fair Credit Reporting Act.

    b.  That the Defendant be enjoined from any and all further misreporting to Plaintiff's credit bureaus.

    c.  Actual damages pursuant to FCRA.

    d.  Statutory damages pursuant to FCRA.

    e.  Costs and reasonable attorney's fees pursuant to FCRA.

    f.  Any other relief that as may be just and proper.

<u>**COUNT II**</u>

<u>**VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**</u>

37. Plaintiff sues Defendant, SHELLPOINT, and alleges:

38. Paragraphs 1 through 28 are hereby re-alleged and incorporated herein by reference, as if fully set forth below.

39. Florida Statutes Chapter 501.204 defines as prohibited practices the following:

"(1) Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(2) It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretation of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s-45(a)(1) as of July 1, 2017."

40. The acts committed by SHELLPOINT as set forth in paragraphs 1 through 27 above constitute a pattern of deceptive and unfair acts and practices in violation of section 5(a) of the Federal Trade Commission Act, 15 U.S.C. s-45(a)(1) and therefore also constitute violations of F.S. 501.204.

41. Fla. Stat. 501.2075 authorizes the Court to award monetary civil penalties in the event of a knowing violation, which constitute a pattern or practice of violations.  Each instance that SHELLPOINT has misreported the amount owed by Plaintiffs to the various credit bureaus and/or SHELLPOINT's failure to honor the previously agreed upon loan modification between the Plaintiffs and CALIBER constitute separate violations of the FDUPTA.

42. As a result of the above violation of the FDUPTA, SHELLPOINT is liable to Plaintiffs for injunctive and declaratory relief and actual damages, statutory damages, and attorney's fees and costs.

   WHEREFORE, Plaintiff requests that judgment be entered against the Defendant, SHELLPOINT, for the following:

   g. Declaratory judgment that Defendant's conduct violated the Florida Deceptive and Unfair Trade Practices Act.

   h. That the Defendant be enjoined from any and all further misreporting to Plaintiff's credit bureaus and debt collection activity.

   i. Actual damages pursuant to FDUPTA.

   j. Statutory damages pursuant to FDUPTA.

   k. Costs and reasonable attorney's fees pursuant to FDUPTA.

   l. Any other relief that as may be just and proper including requiring SHELLPOINT to honor the prior loan modification agreement.

## **BREACH OF CONTRACT**

43. Plaintiff sues Defendant, SHELLPOINT, and alleges:

44. Paragraphs 1 through 28 are hereby re-alleged and incorporated herein by reference, as if fully set forth below.

45. The contractual relationship between Plaintiffs and SHELLPOINT is governed by a written agreement, to wit, the Mortgage.

46. Various terms of the Mortgage were modified by virtue of the loan modification entered into between Plaintiff and SHELLPOINT's predecessor, CALIBER.

47. Said loan modification constitutes a valid offer, acceptance and consideration.

48. SHELLPOINT breached the contract by failing to honor the terms and conditions agreed to by CALIBER.

49. As a result of said breach, Plaintiffs have suffered monetary damages in excess of $15,000.00.

WHEREFORE, Plaintiff requests that judgment be entered against the Defendant for the following:

m. Actual damages

n. Costs and reasonable attorney's fees pursuant to contract

o. Any other relief that as may be just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, demand entry of judgment against Defendant, SHELLPOIINT, for an amount within the jurisdictional limits of this court, including an award of interest and an award of attorneys' fees and costs pursuant to 15 U.S.C. § 1681, F.S. 501, and breach of contract.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury in this action of all issues so triable.

## **RESERVATION OF RIGHTS**

Plaintiffs reserve the right to further amend this Complaint, upon completion of his investigation and discovery, to assert any additional claims for relief against Defendant or other parties as may be warranted under the circumstances and as allowed by law, including any claim for punitive damages against Defendant.

.

Dated: August 5, 2019

Respectfully Submitted,

By: */s/ David E. Borack*
David E. Borack, Esq.
FBN: 998303
P.O. Box 915498
Longwood, FL 32791
Phone: 407-644-8285
Fax: 407-622-4880
Dborack@boracklawgroup.com

When recorded, return to:
Banc of California, N.A., dba Banc Home Loans
Attn: Final Document Department
18500 Von Karman Avenue, Suite 1100
Irvine, CA 92612
800-874-5952

This document was prepared by:
Banc of California, N.A., dba Banc Home Loans
18500 Von Karman Avenue, Suite 1100
Irvine, CA 92612
714-972-0726

Title Order No.: 08-01325448
Escrow No.: 08-01325449
LOAN #:

[Space Above This Line for Recording Data]

## MORTGAGE

MIN
MERS PHONE #: 1-888-679-6377

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
(A) "Security Instrument" means this document, which is dated **September 22, 2016,** together with all Riders to this document.
(B) "Borrower" is **CHRISTOPHER T. SHINGLETON AND FREIDA M. SHINGLETON, HUSBAND AND WIFE.**

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS
(D) "Lender" is **Banc of California, National Association, dba Banc Home Loans.**

Lender is **a National Association,** organized and existing under the laws of
**The United States of America.** Lender's address is **18500 Von Karman Avenue,**
**Suite 1100, Irvine, CA 92612**

(E) "Note" means the promissory note signed by Borrower and dated **September 22, 2016.** The Note states that Borrower owes Lender **TWO HUNDRED ONE THOUSAND AND NO/100**************************************************** Dollars (U.S **$201,000.00** )
plus interest Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **October 1, 2046.**
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
Ellie Mae, Inc                                   Page 1 of 10                          Initials: _____
FLEDEED  0515
FLEDEED (CLS)

MARYANNE MORSE, CLERK OF CIRCUIT COURT  SEMINOLE COUNTY FL
CLERK'S # 2016104579 BK 8781 Pgs 0849 - 861; (13pgs) E-RECORDED 10/10/2016 10:26:20 AM
112.00  MTG DOC 703.50 INTANGIBLE 402.00

LOAN #

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☒ Planned Unit Development Rider    ☐ Other(s) [specify]
☐ 1-4 Family Rider    ☐ Biweekly Payment Rider
☐ V A Rider

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** means those items that are described in Section 3
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation, or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument
(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U S C §2601 et seq ) and its implementing regulation, Regulation X (12 C F R Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower s covenants and agreements under this Security Instrument and the Note For this purpose, Borrower does hereby mortgage grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **County**    of   **Seminole**
    [Type of Recording Jurisdiction]     [Name of Recording Jurisdiction].
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 15-21-31-519-0000-0400**

which currently has the address of   **159 Winding Oaks Lane, OVIEDO,**

[Street] [City]

Florida   **32765**     ("Property Address")
    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
Ellie Mae, Inc                Page 2 of 10

Initials: _____
FLEDEED   0515
FLEDEED (CLS)

LOAN #:

exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts that are then required under this Section 3.

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
Ellie Mae, Inc.                        Page 3 of 10

Initials: _____

FLEDEED 0515
FLEDEED (CLS)

LOAN #:

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  Charges; Liens. Borrower shall pay all taxes, assessments, charges fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any and Community Association Dues Fees, and Assessments if any To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender but only so long as Borrower is performing such agreement, (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan

5.  Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably Lender may require Borrower to pay, in connection with this Loan, either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower

If Borrower fails to maintain any of the coverages described above. Lender may obtain insurance coverage at Lender's option and Borrower's expense Lender is under no obligation to purchase any particular type or amount of coverage Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee Lender shall have the right to hold the policies and renewal certificates If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened During such repair

**FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01**
Ellie Mae, Inc    Page 4 of 10

Initials: _____

FLEDEED  0515
FLEDEED (CLS)

LOAN #:

and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court, and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
Ellie Mae, Inc.                                    Page 5 of 10

Initials: _____
FLEDEED   0515
FLEDEED (CLS)

LOAN #:

shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums)

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance " Further.

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value Any balance shall be paid to Borrower

In the event of a partial taking destruction or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages. Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
Ellie Mae, Inc                               Page 6 of 10

Initials:
FLEDEED  0515
FLEDEED (CLS)

LOAN #:

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
Ellie Mae, Inc.                                                                        Page 7 of 10

Initials: _____

FLEDEED  0515
FLEDEED (CLS)

LOAN #: 7

transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument, (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate, or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred, (b) cures any default of any other covenants or agreements, (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender (a) cash, (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity, or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
Ellie Mae, Inc.                    Page 8 of 10                    Initials: [signature]
                                                                   FLEDEED   0515
                                                                   FLEDEED (CLS)

LOAN #: ?.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows.

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of

_____

_____ _____ 9/22/2016 (Seal)
CHRISTOPHER T. SHINGLETON                                DATE

_____ _____ 9/22/16 (Seal)
FREIDA M. SHINGLETON                                     DATE

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01

Ellie Mae, Inc.                        Page 9 of 10

Initials: _____

FLEDEED 0515
FLEDEED (CLS)

LOAN #:

State of _F L O R I D A_

County of _S E M I N O L E_

The foregoing instrument was acknowledged before me this _22_ day of _SEPT 2016_ by
CHRISTOPHER T. SHINGLETON AND FREIDA M. SHINGLETON, who is/are personally known to me or who
has/have produced _DRIVERS LICENSE_ as identification.



_____
Signature

NOTARY PUBLIC
Title or Rank

_____
Serial Number, (if any)

**GERARDO MARTINEZ**
MY COMMISSION # GG 016831
EXPIRES: August 18, 2020
Bonded Thru Budget Notary Services

Lender: Banc of California, National Association, dba Banc Home Loans
NMLS ID: 530611
Loan Originator: Chad Simmons
NMLS ID: 393519

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
Ellie Mae Inc                                          Page 10 of 10

Initials:

FLEDEED  0515
FLEDEED (CLS)

LOAN #: .
MIN: .

## PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **22nd**      day of
**September, 2016**      and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument")
of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note
to **Banc of California, National Association, dba Banc Home Loans**

(the "Lender")
of the same date and covering the Property described in the Security Instrument and
located at: **159 Winding Oaks Lane, OVIEDO, FL 32765.**

The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described
in **COVENANTS, CONDITIONS AND RESTRICTIONS**

(the "Declaration").
The Property is a part of a planned unit development known as **Whispering Woods**

(the "PUD"). The Property also includes Borrower's interest in the homeowners association
or equivalent entity owning or managing the common areas and facilities of the PUD
(the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the
PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration;
(ii) articles of incorporation, trust instrument or any equivalent document which creates
the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners
Association. Borrower shall promptly pay, when due, all dues and assessments
imposed pursuant to the Constituent Documents.
**B. Property Insurance.** So long as the Owners Association maintains, with a
generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property
which is satisfactory to Lender and which provides insurance coverage in the amounts
(including deductible levels), for the periods, and against loss by fire, hazards included
within the term "extended coverage," and any other hazards, including, but not limited
to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives
the provision in Section 3 for the Periodic Payment to Lender of the yearly premium
installments for property insurance on the Property; and (ii) Borrower's obligation under
Section 5 to maintain property insurance coverage on the Property is deemed satisfied
to the extent that the required coverage is provided by the Owners Association policy.
What Lender requires as a condition of this waiver can change during the term of the loan.
Borrower shall give Lender prompt notice of any lapse in required property
insurance coverage provided by the master or blanket policy.
In the event of a distribution of property insurance proceeds in lieu of restoration or
repair following a loss to the Property, or to common areas and facilities of the PUD, any
proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender
shall apply the proceeds to the sums secured by the Security Instrument, whether or
not then due, with the excess, if any, paid to Borrower.
**C. Public Liability Insurance.** Borrower shall take such actions as may be
reasonable to ensure that the Owners Association maintains a public liability insurance
policy acceptable in form, amount, and extent of coverage to Lender.

Initials: _____

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150 1/01
Ellie Mae, Inc.                                    Page 1 of 2                              F3150RDU   0115
                                                                                            F3150RLU (CLS)

LOAN #: 2378160414

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____    9/22/2016 (Seal)
CHRISTOPHER T. SHINGLETON                    DATE

_____    9/22/16 (Seal)
FREIDA M. SHINGLETON                          DATE

Initials: _____

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150 1/01
Ellie Mae Inc                      Page 2 of 2                      F3150RDU  0115
                                                                    F3150RLU (CLS)

## EXHIBIT "A"

### LEGAL DESCRIPTION

File No:

ALL THAT CERTAIN LAND SITUATE IN SEMINOLE COUNTY, FLORIDA, VIZ:

LOT 40 OF WHISPERING WOODS, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 42, PAGE(S) 41 AND 42, OF THE PUBLIC RECORDS OF SEMINOLE COUNTY, FLORIDA.

BEING THE SAME PROPERTY CONVEYED TO CHRISTOPHER T. SHINGLETON AND FREIDA M. SHINGLETON, HUSBAND AND WIFE BY DEED FROM RUSSELL W. GELL AND BETTE L. GELL, HUSBAND AND WIFE AS TO A LIFE ESTATE OF VICKI SUE BALL, AS TO THE REMAINDER RECORDED 03/10/2014 IN DEED BOOK 08223 PAGE 1583, IN THE PUBLIC RECORDS OF SEMINOLE COUNTY, FLORIDA.

Exhibit B

1054010        17

US POSTAGE AND FEES PAID

**FIRST-CLASS**
Jan 29 2018
Mailed from ZIP 56303
3 oz First-Class Mail Flats Rate



endicia.com

071V00922396

CALIBER HOME LOANS, INC.
13801 WIRELESS WAY
OKLAHOMA CITY OK 73134

CHRISTOPHER SHINGLETON
159 WINDING OAKS LN
OVIEDO FL 32765

Envelope: 912LTR
Total Pages: 7
CaliberFoldedBRE(44114)





January 27, 2018

CHRISTOPHER SHINGLETON
FREIDA M SHINGLETON
159 WINDING OAKS LN
OVIEDO, FL 32765

| | | |
|---|---|---|
| Account Number: | 2179 | |
| Property Address: | 159 WINDING OAKS LN | |
| | OVIEDO, FL 32765 | |

Dear CHRISTOPHER SHINGLETON and FREIDA M SHINGLETON,

Thank you for contacting us about your mortgage. Based on a careful review of your mortgage account, we are offering you an opportunity to enter into a Trial Period Plan for a mortgage modification. This is the first step toward qualifying for a modification to bring your mortgage current and allow you to make a principal and interest payment that is equivalent or almost equivalent to your existing contractual principal and interest payment. It is important that you read this information in its entirety so that you completely understand the actions you need to take to successfully complete the Trial Period Plan to permanently modify your mortgage.

**Proposed Modification Terms**
If you successfully complete the Trial Period Plan by making the required payments and satisfying any outstanding conditions (see Next Steps below), you will receive a modification with an interest rate of **3.875%**, which will be fixed for 361 months from the date the modification is effective.

**To Accept This Offer**
You must contact us by phone or in writing at the address provided below no later than February 10, 2018, to indicate your intent to accept this offer. In addition, you must make your first Trial Period Plan payment by the first payment due date designated below.

If you fail to make the first Trial Period Plan payment by the first payment due date and we do not receive the payment by the last day of the month in which it is due, this offer will be revoked and depending upon the level of delinquency, we may refer your loan to foreclosure.

**TIME IS OF THE ESSENCE.**

**Make Trial Period Payments**
To successfully complete the Trial Period Plan, you must make the Trial Period Plan payments below.

- First payment: $1,266.10 by 03/01/2018
- Second payment: $1,266.10 by 04/01/2018
- Third payment: $1,266.10 by 05/01/2018



Please send your Trial Period Plan payments to:

Caliber Home Loans, Inc.
13801 Wireless Way
Oklahoma City, OK 73134

If you have questions about your Trial Period Plan or permanent modification requirements, please contact us at:

Caliber Home Loans, Inc.
Attn: Single Point of Contact
13801 Wireless Way
Oklahoma City, OK 73134
Phone Number: (800) 401-6587
Fax Number: (405) 608-2011
Email: spoc@caliberhomeloans.com
www.caliberhomeloans.com
Hours of Operation: Monday - Thursday 8:00 a.m.
- 9:00 p.m., CST Friday 8:00 a.m. - 7:00 p.m., CST

**Next Steps**

- It is important that you thoroughly review the *Additional Trial Period Plan Information and Legal Notices and Frequently Asked Questions* information attached.

- **We reserve the right to revoke this offer or terminate the plan following your acceptance if we learn of information that would make you ineligible for the Trial Period Plan, including Caliber confirming you are the valid Successor in Interest, if applicable.**

- Please note that your trial period may extend beyond the dates provided. Continue making your trial period payments in the same amount by the same day of each month as your specified trial payments until you receive your final modification or notification that you are no longer eligible for a modification.

  Some reasons for the extension relate to other liens on the property that must be addressed prior to final approval of your modification. This includes, but is not limited to, subordination agreements from junior lienholders and your payment of applicable judgement liens. Your mortgage can only be modified after we determine that all of your trial period payments were made on time, you submitted all the required documents, and title clearance requirements have been satisfied. If title issues cannot be resolved that prevent us from proceeding with the modification for any reason, your modification may not be approved, even if you pay the trial period payments. If you do not make all trial period payments, including if your trial period payments were extended, your Trial Period Plan will be denied.

- If you continue to remain eligible for the permanent modification, once you have successfully made each of the payments above by their due dates, you have submitted the required signed copies of your modification agreement, and we have signed the modification agreement, your mortgage will be permanently modified in accordance with the terms of your modification agreement.

- **We must receive each payment, in the month in which it is due. If you miss a payment or do not fulfill any other terms of your trial period, this offer will end and your mortgage loan will not be modified.**

- If you feel that you cannot afford the Trial Period Plan payments reflected above and you otherwise qualify, we may be able to offer you a Streamlined Modification with a lower monthly principal and interest payment than what we estimate you would receive for the proposed modification described above. However, note that the Streamlined Modification would extend the term of your mortgage loan to 40 years from the date the modification takes effect

while the modification described in this Trial Period Plan would extend the term of your mortgage loan only to the point necessary to bring your principal and interest payment back to an amount close to your existing contractual principal and interest payment. Please contact us at the telephone number indicated above for further information regarding a Streamlined Modification.

- If you feel that you cannot afford the Trial Period Plan payments shown above but want to remain in your home, or if you have decided to leave your home, please contact us at the telephone number indicated above to discuss other alternatives to foreclosure.

- Please note that except for your monthly Trial Period Plan payment amount, the terms of your existing note and all mortgage requirements remain in effect and unchanged during the Trial Period Plan.

- If you have questions about this information, your Trial Period Plan payments, or our mortgage modification requirements, please contact us at the telephone number indicated above.

**Additional Trial Period Plan Information and Legal Notices**

**We will not refer your loan to foreclosure during the Trial Period Plan, provided you are complying with the terms of the Trial Period Plan:**

- You agree that we will hold the Trial Period Plan payments in an account until sufficient funds are in the account to pay your oldest delinquent monthly payment. You also agree that we will not pay you interest on the amounts held in the account. If any money is left in this account at the end of the Trial Period Plan and you qualify for a permanent loan modification, those funds will be deducted from amounts that would otherwise be added to your modified principal balance.

- Our acceptance and posting of your payment during the Trial Period Plan will not be deemed a waiver of the acceleration of your loan and related activities, including the right to resume or continue foreclosure, and shall not constitute a cure of your mortgage default unless such payments are sufficient to completely cure the default.

**If your monthly payment did not include escrows for taxes and insurance, you are now required to do so:**

- You agree that any prior waiver that allowed you to pay directly for taxes and insurance is revoked. You agree that we will establish an escrow account and that you will pay required escrows into that account.

**Your current loan documents remain in effect; however, you may make the Trial Period Plan payment instead of the payment required under your loan documents**

You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the Trial Period Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

**Modification Program Review**

You were evaluated for mortgage payment assistance based on the eligibility requirements of Fannie Mae, the owner of your mortgage loan. Borrowers must meet Fannie Mae's eligibility requirements to be eligible for a loan modification Trial Period Plan.

Based on our review of your financial circumstances, you are approved for a Fannie Mae Capitalization and Extension Modification Trial Period Plan.

You were not evaluated based on other eligibility requirements.



**If you would like to assert an error relating to the servicing of your mortgage loan and/or request information relating to the servicing of your mortgage loan, you must use the following address we have designated for written requests regarding your mortgage loan: Caliber Home Loans Inc. P.O. Box 270415, Oklahoma City, OK 73137.**

Sincerely,
Single Point of Contact
SPOC Department
Caliber Home Loans, Inc.

**THIS COMMUNICATION IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Notice to Consumers presently in Bankruptcy or who have a Bankruptcy Discharge: If you are a debtor presently subject to a proceeding in Bankruptcy Court, or if you have previously been discharged from this debt by a Federal Bankruptcy Court, this communication is not an attempt to collect a debt but is sent for informational purposes only or to satisfy certain Federal or State legal obligations.

| FREQUENTLY ASKED QUESTIONS | Get the answers you need to some of the most common questions. |

**Q. What else should I know about this offer?**

- If you make your new Trial Period Plan payments timely and you continue to remain eligible for the permanent modification, **we will not conduct a foreclosure sale.**
- You will not be charged any fees for this Trial Period Plan or a permanent modification.
- If your loan is modified, we will waive all unpaid late charges.
- **Credit Reporting:** We will not report the delinquency status of your loan or your entry into a Trial Period Plan to credit reporting agencies during the Trial Period Plan so long as you are paying in accordance with the terms of this Trial Period Plan. **CREDIT SCORING COMPANIES MAY CONSIDER WHETHER THERE IS AN INCREASED CREDIT RISK DUE TO THE LACK OF REPORTING. WE ARE UNCERTAIN AS TO THE IMPACT ON YOUR CREDIT SCORE, PARTICULARLY IF YOU ARE CURRENT ON YOUR MORTGAGE OR OTHERWISE HAVE A GOOD CREDIT SCORE.** For more information about your credit score, go to ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.

**Q. Why is there a Trial Period Plan?**

The Trial Period Plan offers you immediate payment relief and gives you time to make sure you can manage the new monthly mortgage payment. The Trial Period Plan is temporary, and your existing loan and loan requirements remain in effect and unchanged during the Trial Period Plan.

**Q. When will I know if my loan can be modified permanently and how will the modified loan balance be determined?**

If you continue to remain eligible for the permanent modification, once you make all of your Trial Period Plan payments on time and return to us two copies of a modification agreement with your signature, we will sign one copy and send it back to you so that you will have a fully executed modification agreement detailing the terms of the modified loan. Any difference between the amount of the Trial Period Plan payments and your regular mortgage payments will be added to the balance of your loan along with any other past due amounts as permitted by your loan documents. While this will increase the total amount that you owe, it should not significantly change the amount of your modified mortgage payment.

**Q. Will my interest rate and principal and interest payment be fixed after my loan is permanently modified?**

Once your loan is modified, your interest rate and monthly principal and interest payment will be fixed for the life of your mortgage. Your new monthly payment will include an escrow for property taxes, hazard insurance and other escrowed expenses. If the cost of your homeowners insurance, property tax assessment or other escrowed expenses increases, your monthly payment will increase as well.

**Your current loan documents remain in effect; however, you may make the Trial Period Plan payment instead of the payment required under your loan documents:**

- You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the Trial Period Plan shall be

understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

Account Number:          2179

Exhibit C

---------- Forwarded message ---------
From: **Garrett Bradshaw** <            w@laderalending.com>
Date: Tue, Apr 30, 2019 at 4:25 PM
Subject: 159 Winding Oaks Ln
To: Chris Shingleton <            n@gmail.com>

Good afternoon Chris,

I hope you've been well since the last time we spoke!

This email is designed to confirm that Ladera Lending was on the brink of getting the refinance we were previously working on closed for you up until Shellpoint Mortgage Servicing reported late payments and a past-due payment amount on the credit report pertaining to your mortgage.

Best regards,

**Garrett Bradshaw**

**Senior Loan Advisor**

**Ladera Lending, Inc.**

555 Corporate Drive Suite 215

Ladera Ranch CA 92694

NMLS ID #: 1479090

Direct: (949) 860-7592

Fax: (949) 860-7592

 

--